1
2
3
4
5
6
7
　　　　　　　　UNITED STATES DISTRICT COURT
　　　　　　　WESTERN DISTRICT OF WASHINGTON
8
　　　　　　　　　　　　AT TACOMA
9
10　　B.D. and D.D., parents of C.D.,

11　　　　　　　　Plaintiffs,　　　　　　　Case No. C09-5020RJB

12　　　　　v.　　　　　　　　　　　　　ORDER ON PETITION
　　　　　　　　　　　　　　　　　　　　FOR JUDICIAL REVIEW
13　　PUYALLUP SCHOOL DISTRICT,　　　　AND COMPLAINT

14　　　　　　　　Defendant.

15

16　　　　　This matter comes before the court on plaintiff's Petition for Judicial Review and Complaint. Dkt.

17　3. The court has reviewed the entire record, and has considered the relevant documents and the remainder

18　of the file herein.

19　　　　　This case was filed by the parents of a child (the student) who claim that the defendant Puyallup

20　School District (district) failed to provide the student with a free appropriate public education as required

21　by the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. §§ 1400-1491.

22　　　　　　　　　　　　　　　　GLOSSARY

23　　　　　Because many of the terms and phrases used in this order are referred to by their initials, the

24　following glossary is provided:

25　　　　　IDEA: Individuals with Disabilities Act

26　　　　　LKS: Landau-Kleffner Syndrome

27　　　　　EEG: Electroencephalogram

28

ADHD: Attention Deficit Hyperactivity Disorder

ALJ: Administrative Law Judge

BIP: Behavior Intervention Plan

OCD: Obsessive Compulsive Disorder

FAPE: Free Appropriate Public Education

FBA: Functional Behavior Assessment

IEP: Individualized Education Program

OCR: Office of Civil Rights

OSPI: Office of the Superintendent of Public Instruction

SLP: Speech/Language Pathologist

<u>RELEVANT FACTS</u>

Throughout this order, the court will refer to the administrative record with the abbreviation AR, followed by the page number.

*Relevant Background.* The limitations period for an IDEA claim bars any claims for incidents/events that occurred before February 1, 2006. Events that occurred before that date are relevant only as background information, to develop the context for what occurred during the period at issue, February 1, 2006 through June 10, 2008, the end of the state due process hearing.

At the age of three, the student began receiving special education services from the district for general developmental delays. AR at 28. In (or at some time before) 1996, the student was diagnosed with Landau-Kleffner Syndrome (LKS), a rare neurological disorder, which causes severe expressive and receptive aphasia and abnormal EEG readings; the disorder is typically expressed by seizures or epilepsy. AR 28. There have been only about 200 cases of LKS in the literature. AR 5487. The student's onset of LKS was at about 18 months old, with a total loss of speech ability, to the extent that speech had developed. AR 28. At the age of five, the student underwent brain surgery for the condition, to control seizure activity. AR 28. Although the student regained the ability to speak after that surgery, LKS continues to cause severe receptive and expressive communication delays. AR 28.

People with LKS can present with a variety of symptoms and behaviors. AR 29. In addition to the speech regression or aphasia and EEG changes associated with LKS, Attention Deficit Hyperactivity

Disorder (ADHD) and/or Obsessive Compulsive Disorder (OCD) can co-exist with LKS. AR 29. The student has co-morbidity with both ADHD, and with OCD, the latter diagnosed during the summer after 8th grade, in 2006. AR 29.

Throughout the student's time in the district, his special education services have been delivered pursuant to an individualized education program (IEP). The student attended the same elementary school from 1998 through 2003, from 1st through 5th grades. AR 30. He then attended sixth grade at another elementary school so that he could take advantage of a program more focused on academics, pursuant to recommendations in his 2003 evaluation. AR 30.

During the student's 7th grade year, 2004-05, he attended Ferrucci Junior High school (Ferrucci). Ferrucci had two Adjustment classrooms and a SAIL [this term, or acronym, is not defined by the parties] classroom that were located adjacent to one another, thereby allowing the student to participate in both programs. Both SAIL and Adjustment classrooms are self-contained programs for disabled students, and both deliver academic instruction based on each individual student's IEP, including functional academics and functional life skills. AR 794. However, students in Adjustment classrooms generally have slightly higher cognitive functioning and/or better developed life skills than their counterparts in the SAIL program. *See* AR 7207- 08.

In May of 2005, the parents met with Ms. Suzan Zakhary, Assistant Director of Special Education, to discuss pending program and staffing changes at Ferrucci, and a possible move to Kalles middle school. AR 1997. The district decided, after input from the parents, to continue the student at Ferrucci for his 8th grade year (2005-06) in the Adjustment program on a full time basis. AR 7222.

The student's IEP was completed on November 28, 2005. AR 2601. The IEP addressed academics (reading, written expression, math) and communication. AR 2601-2617. The IEP identified supplementary aids and services needed to support the student, including books on tape/stories on CDs; a timer to practice timed tasks; word processing such as an Alpha smart; a classroom computer or similar assistive technology; and taped texts for reading activities. AR 2601, *et seq*. On November 9, 2005, Sean Iddings, Speech/Language Pathologist (SLP), stated in an e-mail what he believed to be the most appropriate level of assistive technology for the student:

Here's what I think needs to happen regarding assistive technology for [the student] in the next few

months. Create and teach [the student] to use a communication notebook containing Picture Communication Symbols divided into categories. [The student] needs to show motivation to use and mastery of picture symbol use before we can consider anything high-tech for him. In the meantime, as much as possible I would pair auditory directions with picture symbols to help increase his picture vocabulary and possibly his motivation to use pictures.

AR 641.

In the Fall of 2005, Tricia Myers, the student's case manager and teacher at Ferrucci, met with the parents to discuss their concern that the student was being bothered by general education students in the common area. AR 5005. In response, the district provided the student with greater supervision for the school year, and provided him an alternative space to go to in the mornings other than the commons. AR 5005. Ms. Myers stated that the parents were aware that in the Fall of 2005, the student was having difficulties with another special education student (Student A) in the class. AR 5005. Ms. Myers informed the parents that teachers were working with Student A to make sure that the student was not bothered or harassed. AR 5005-06.

*8th Grade at Ferrucci, after February 1, 2006.* The time period at issue in this case started February 1, 2006, during the student's 8th grade year at Ferrucci.

As the school year progressed, the parents began communicating concerns to the district staff about the amount and type of assistive technology provided to the student, inadequate training teachers had received for the assistive technology, and harassment of the student by other students in the special education class and by general population students.

In late January or early February of 2006, the parents informed teachers that hot sauce was discovered on the student's clothes after he came home from school. AR 5005-06. The teachers investigated and determined that Student A had poured hot sauce on the student's jacket, hat and binder during a school activity. AR 5006. Student A was disciplined for the incident. AR 5006. Another student, Student B, was in the student's class at Ferrucci. Student B sang when the students were passing between classes. The student was bothered by noises, including the singing. The teachers intervened to stop the singing, when they saw that it was bothering the student. The teachers also told the student that he could go to another room if the singing bothered him. AR 5620.

The parents decided to remove the student from school on at the end of May or early June of 2006, on the basis that the student was being harassed, and that he had developed an ulcer as a result of the stress

from the harassment.  AR 4908, 5416.

*9th Grade at Aylen Junior High (Aylen), 2006-March, 2007.*  The student was transferred to Aylen at the beginning of his 9th grade year.  The parents raised the issue of assistive technology with teachers in September of 2006, at the beginning of the school year.  On September 14, 2006, Mr. Iddings completed an assessment on behalf of the Assistive Technology Team, regarding the most appropriate system to facilitate communication by and with the student.  Mr. Iddings recommended that a system of picture communication symbols, a voice output communication device, a dynamic-display device be used with the student to address receptive and expressive communication issues. AR 2724.

In September of 2006, the parents e-mailed the student's teacher with concerns that the student who had harassed their son last year (hot sauce incident) had transferred with him to Aylen. The parents were told that Student A did not move to the student's class at Aylen.  Student B (the singer) was moved to Aylen with the student.  At this point, the parents did not understand that there were two different students (A and B) who were involved with what they believed to be harassment of the student. AR 5431. The parents continued to be concerned about the assistive technology provided to the student and the training of the teachers regarding the assistive technology.

On October 9, 2006, the parents filed a complaint with the Office of the Superintendent of Public Instruction (OSPI), alleging that (1) the student was being placed in a work and life skills program rather than a program more focused on academics; (2) the student was not being afforded assistive technology, as had been identified in the IEP; and (3) the student was being subjected to ongoing harassment.  AR 477-478.

In November of 2006, the parents filed a complaint with the Office of Civil Rights (OCR), regarding alleged harassment and bullying of the student at school during the 2005-06 and 2006-07 school years.  On April 6, 2007, the OCR found the allegations of harassment, bullying, and discrimination were not substantiated; and that the district took prompt and effective action to address the incidents in question. AR 1800.

In November of 2006, in connection with development of the November 13, 2006 IEP, the parents informed the staff that the student had just been diagnosed with OCD.  This IEP noted that the student was not motivated to use the Links PLUS, an assistive technology device with text, word prediction, and voice

output; and noted that Clicker 5 software was being set up to use with the student. AR 2798. This IEP also suggested a referral to the Behavior Support Specialist Team for observation and Assessment. AR 2798.

On December 18, 2006, the parents and district staff met to discuss behavioral issues exhibited by the student. The student was scheduled for a behavior assessment at the school, and an evaluation at Children's Hospital for an assessment of assistive technology and speech needs. AR 2856-57. On December 29, 2006, the Children's Hospital Assessment was completed, and various recommendations for assistive technology were made. AR 2873.

The district participated in mediation to resolve the OSPI complaint. On January 8, 2007, the district provided a Corrective Action Plan, addressing compensatory services to be provided to the student, requirements for IEP meetings, and training. AR 2880.

On January 29, 2007, the district received a document from the parents, making recommendations for the January 29, 2007 IEP. AR 2921. The document made 21 suggestions, including change in placement; specific computer programs; specific methodology and teaching strategies; specific services; "[w]ant grades not pass or fail;" "[l]imit the jumping from one subject to the next. Like addition one day, subtraction the next, multiplying and so on. Give time for [the student] to process each level"; "Have a Behavioral, Speech, Educational evaluation performed by a specialist that is knowledgeable about LKS, OCD and ADHD". AR 2921.

On February 12, 2007, an IEP was completed. AR 2954. Regarding Emotional/Social/Behavioral Development, the IEP stated as follows:

> Present Levels: [The Student's] auditory processing challenges and difficulty with the production of written output and verbal responses to instruction adversely impact his educational experience. These challenges may indicate an avoidance of routine expectations and a difficulty processing sensory information in the classroom environment. [The student] is a friendly and compassionate person. He has excellent visual processing skills. [The student] is an excellent artist, great on the computer, and enjoys getting along with others. [The student] has a love for movies, comics, games, and the computer. [The student] requires and will benefit from specific behavioral goals and objectives which can be addressed throughout the school day. Areas of concern indicate an avoidance of routine expectations, sensory overload, and a deficit in expressive language skills. [The student] appears to be anxious, and as a result becomes overwhelmed by daily academic tasks. [The student] will benefit from explicit instruction on how to utilize meaningful calming strategies that will increase his ability to engage in his academics with consistency. Currently, staff is working with [the student] on initiating and completing in class work.

AR 2958. The IEP recommended a referral to the Behavior Support Specialist Team for assessment; with

the possibility of a Functional Behavior Assessment (FBA) and/or Behavior Intervention Plan (BIP). AR 2958-59. The IEP incorporated various assistive technology devices/programs into the student's program.

On March 16, 2007, a FBA was completed. The FBA described the following concerning behaviors: Fails to initiate work; fails to complete work; complains of physical pain; falls to the floor–flails his body; bangs his head against his chair and/or desk; breaks his pencil in half; complains of being tired; yells "no" "I can't" "no" "arm broken" "head broken etc." AR 898, 3033. Strategies were identified to address the behavioral issues. AR 3032, *et seq.* The parents disagreed with the description of some of the behaviors, some of the reasons underlying those behaviors, and some of the strategies proposed. AR 3062. At the hearing, the father testified as follows: "Again, it's the way the curriculum was presented to him. If they understood his disability, they would have accommodated it and they would have been able to reach his strengths." AR 5440.

*9th Grade at Ballou, Spring-Early Summer, 2007.* In March of 2007, the district proposed moving the student to Ballou Junior High School (Ballou). The parents agreed to the move on the following conditions: (1) that Shelly Guertin, who was one of the para educators at Aylen, follow the student to Ballou, in order to minimize the stress/effects that would be caused due to the move; (2) that all assistive technology programs in the IEP are operational and will be administered by qualified staff; and (3) that Amanda Adams continue as the student's SLP therapist. AR 3026.

The student started school at Ballou on March 27, 2007. Ms. Guertin was the student's para educator while he was at Ballou, working with him one-on-one. The student experienced difficulties staying on task at school, had behavioral difficulties, and resisted going to school. The student was frequently absent from school, for illness and health appointments, and for refusing to come to school. At about this time, the medications given to the student were being changed and/or adjusted by the student's physicians. AR 6043-6046. In June of 2007, the parents requested that the student's day end at 11:30, and that SLP services be discontinued. The parents believed that the student's conflict with the SLP assigned to provide him services (Lisa Johnston) was contributing to his behavior problems. After the regular school year ended, the district offered a six week summer program for the student at one of the district's schools; the parents declined the offer because they believed that it would be more appropriate for the student to have services come into the home.

Sheila Winkler, Ph.D., an independent SLP who had worked with the student until March of 2003, was retained by the district to provide speech and language services to the student, in accord with the Corrective Action Plan filed with the OSPI. Dr. Winkler began sessions again with the student, in her office, on March 26, 2007, and continued to work with him until shortly before the due process hearing. AR 5989-5990.

At the end of June of 2007, the student began to have sessions with Ann Uherek, Psy.D., an independent psychologist authorized by the district. The presenting signs and symptoms included agitation, anxiety/tension, disruptive conduct, impaired judgment, mood swings and somatization. AR 3208, *et seq*. Those visits continued, according to documents in the record, until March of 2008.

*10th Grade Home Bound Program, 2007*. On September 17, 2007, an IEP was completed for a home bound program for the student. AR 3274. The student received one to one tutoring in academics from a school psychologist, three days a week; and he went to see Dr. Winkler three times a week. The parents did not believe that it was appropriate to start the student at Rogers High School during the Fall of 2007.

Another IEP was issued November 6, 2007. AR 3373. A BIP was adopted for the student's in-home program. AR 917. On December 13, 2007, the IEP team met with Dr. Uherek to discuss anxiety, autism, and LKS issues. AR 5560. The focus of the meeting was on transitioning the student from the home to the school setting. AR 5560.

On January 8, 2008, Gayle Fay, Ph.D., a neuropsychologist, made recommendations for programs, including computer programs, to assist the student with learning, following her neuropsychological evaluation of the student. AR 3479. On January 10, 2008, a BIP was adopted for the student's transition to Rogers High School. AR 924.

*10th Grade, Rogers High School, 2008*. The district developed a transition plan to move the student from home bound to the library, then to Rogers High School. An IEP was adopted January 14, 2008. AR 3505.

The student started at Rogers High School on January 23, 2008, with a shortened day schedule. On January 27, 2008, the parents informed the student's teacher that he would not be attending school on January 28, 2008, and would keep his current Tuesday-Thursday schedule [for one hour each day] until a

qualified personal para educator was in place and was familiar with the student. AR 3601. During this time, the parents were trying to have Shelly Guertin, the student's prior one to one para educator, transfer from her position at Ballou to Rogers to be the student's para educator. AR 4232. The parents also expressed their belief that the student should be taught by a specialist in LKS. On January 20, 2008, another IEP was issued, adding time to the student's day. AR 3604. Ms. Guertin was not assigned to Rogers, and continued to work at Ballou.

During February of 2008, the student resisted coming to school at times, and at times appeared to function well. AR 3779. The parents, however, appeared to have some difficulty in communicating with district employees. AR 3779. The student was using computer learning programs during this time.

The student's IEP was revised on April 22, 2008; the IEP provided for a longer day at Rogers. AR 3896. It is unclear whether that IEP was finalized, but the district followed it. It appears that the student continued to be enrolled at Rogers, up to the time of the hearing. However, at the hearing, the parents informed the ALJ that the student was at home because he refused to go to school. AR 5359.

The parents' communications with the district, over the period at issue in this case, are too numerous to cite in this order. The parents participated in meetings, and sent letters and e-mails to teachers, the professional staff, and other district employees, identifying problems with teaching methods, teachers, resources, outside services, other students, and knowledge level of the district employees; complaining about the lack of response or inadequate response of the district; and suggesting particular types of teaching methods, assistive technology, outside services, and staff to work with the student.

## IDEA

The IDEA provides for federal funds to assist state and local agencies in educating children with disabilities, but conditions such funding on compliance with certain goals and procedures. *N.B. v. Hellgate Elementary Sch. Dist.*, 541 F.3d 1202, 1207 (9th Cir.2008). The primary goal of the IDEA is to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services. *See* 20 U.S.C. § 1400(d)(1)(A). A state must comply both procedurally and substantively with the IDEA. *N.B. v. Hellgate Elementary Sch. Dist*, 541 F.3d at 1207. State standards that are not inconsistent with federal standards under the IDEA are also enforceable in federal court." *Id.* at 1208. States satisfy the substantive requirements of the IDEA by providing a disabled

child with a free appropriate public education (FAPE).

In 1975, Congress enacted the Education for All Handicapped Children Act, which contained the following definition of a "free appropriate public education":

> The term "free appropriate public education" means special education and related services which (A) have been provided at public expense, under public supervision and direction, and without charge, (B) meet the standards of the State educational agency, (C) include an appropriate preschool, elementary, or secondary school education in the State involved, and (D) are provided in conformity with the individualized education program required under section 614(a)(5).

20 U.S.C. § 1401(8)(D).

To comply with the substantive requirements of the IDEA, the state must "confer some educational benefit upon the handicapped child." *Board of Education of the Hendrick Hudson Central School District v. Rowley*, 458 U.S. 176, 200 (1982). In *Rowley*, the Supreme Court established a two-part test to determine whether a state has provided a free appropriate public education. *Id*. at 206-07. First, has the State complied with the procedures set forth in the Act? *Id*. Second, is the individualized educational program developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits? *Id.* "If these requirements are met, the State has complied with the obligations imposed by Congress and the courts can require no more." *Id.* at 207. *See also N.B. v. Hellgate Elementary Sch. Dist.*, 541 F.3d 1202 1213 (9th Cir. 2008)("a school must provide a student with a 'meaningful benefit' in order to satisfy the substantive requirements of the IDEA")).

The parents argue that the 2004 amendments to the IDEA require school districts to maximize the student's potential rather than merely confer some educational benefit to the child. That argument was recently rejected in *J.L. v. Mercer Island Sch.Dist.*, 2009 WL 2393323 (9th Cir.Wash. August 6, 2009), with regard to the 1997 amendments to the IDEA. The parents have not shown that the standard under the 2004 amendments to the IDEA would require a standard higher or different than that set forth in *Rowley*. The ALJ applied the *Rowley* educational benefit test, with the requirement that that educational benefit must be meaningful. The standard the ALJ applied is consistent with the law.

20 U.S.C. §§ 1400-1482 assures that all disabled children receive a FAPE through an IEP. 20 U.S.C. § 1400(d)(1)(A). Under the IDEA, a FAPE is guaranteed, in part, by certain procedural safeguards for the disabled child and his or her parents. 20 U.S.C. § 1415(a); *L.M. v. Capistrano Unified Sch. Dist.*, 556 F.3d 900, 909 (9th Cir.2009). However, "[p]rocedural flaws in the IEP process do not always amount

to the denial of a FAPE." *Id.* (citing *W.G. v. Bd. of Trs. of Target Range Sch. Dist., No. 23*, 960 F.2d 1479, 1484 (9th Cir.1992)). Rather, once a court finds a procedural violation of the IDEA, it "must determine whether that violation affected the substantive rights of the parent or child." *Id.* "The burden of proof in an administrative hearing challenging an IEP is properly placed upon the party seeking relief." *Schaffer v. Weast*, 546 U.S. 49, 62 (2005).

## DUE PROCESS HEARING

The IDEA allows a party to present to the State educational agency a complaint with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child. 20 U.S.C. § 1415(b)(6). That party is entitled to a due process hearing before the state agency. 20 U.S.C. § 1415(f).

On February 1, 2008, the parents submitted a Due Process Hearing Request to the Superintendent of Public Instruction. AR 156. On April 17, 2008, the administrative law judge (ALJ) issued an order, concluding that events or conduct that occurred before February 1, 2006, are barred by the limitations period of 20 U.S.C. § 1415(f)(3)(C)(2005). AR 92. That finding/conclusion has not been challenged in this petition for review. The time period at issue, therefore, is from February 1, 2006, until the conclusion of the due process hearing on June 10, 2008. The ALJ identified sixteen substantive allegations and six procedural allegations that were considered at the administrative hearing. *See* AR 24-26.

On October 23, 2008, the ALJ issued Findings of Fact, Conclusions of Law and Final Order, concluding that (1) the district provided a FAPE to the student during the period from February 1, 2006, to June 10, 2008; and (2) the parents have not proven the allegations in the due process hearing complaint by a preponderance of evidence, and are not entitled to the remedies requested. AR 21-77.

## PETITION FOR JUDICIAL REVIEW AND COMPLAINT

Under the IDEA, any party aggrieved by the findings and decision made in a due process hearing, or a party who has appealed a due process hearing's findings and decision to a State educational agency, shall have the right to bring a civil action and the action may be brought in any State court of competent jurisdiction or in a district court of the United States, without regard to the amount in controversy. 20 U.S.C. § 1415(i)(2)(A).

On January 29, 2009, the parents filed this civil action against the district, contending that (1) the

district deprived the student of a Free Appropriate Public Education, in violation of the Individuals with Disabilities in Education Act, 20 U.S.C. § 1400; and (2) the district violated the Washington State Education for All Act, RCW 28A.13 (Recodified as Chapter 28A.155 RCW, pursuant to 1990 Wash.Sess. Laws c 33§ 4). Dkt. 3. The parents request that the court reverse the decision of the ALJ, find that the student was denied a FAPE, and order an appropriate education based upon the student's needs. The court has jurisdiction over the IDEA claim, pursuant to 28 U.S.C. § 1331; and has supplement jurisdiction over the Education for All Act claim, pursuant to 28 U.S.C. § 1367.

In their opening brief, the parents indicated that they are not requesting review of four of the substantive issues and two of the procedural issues identified by the ALJ. The remaining issues raised by the parents relate to twelve rulings by the ALJ on substantive issues and four rulings on procedural issues.

## WASHINGTON EDUCATION FOR ALL ACT

Wash.Const. art. IX § 1 provides as follows: "It is the paramount duty of the state to make ample provision for the education of all children residing within its borders, without distinction or preference on account of race, color, caste, or sex." The Washington legislature enacted the Education for All Act, RCW 28A.155, to ensure that all children with disabilities shall have the opportunity for an appropriate education at public expense as guaranteed by the Washington Constitution and applicable federal laws. RCW 28A.155.010.

## STANDARD OF REVIEW UNDER IDEA

The court reviews an IDEA administrative decision on "the preponderance of the evidence." 20 U.S.C. § 1415(i)(2)(B)(iii). Conclusions of law or mixed questions of fact and law are reviewed *de novo* unless the mixed question is primarily factual. *Gregory K. v. Longview Sch. Dist.*, 811 F.2d 1307, 1310 (9th Cir.1987)). "The fact-intensive nature of a special education eligibility determination coupled with considerations of judicial economy render a more deferential approach appropriate." *R.B ex rel F.B. v. Napa Valley Unified Sch. Dist.*, 496 F.3d 932, 937 n.1 (9th Cir.2007) *(quoting Hood v. Encinitas Union Sch. Dist.*, 486 F.3d 1099, 1104 n. 4 (9th Cir.2007)). A court "shall accord more deference to administrative agency findings that it considers 'thorough and careful.' " *L.M v. Capistrano Unified Sch. Dist.*, 556 F.3d 900, 908 (9th Cir.2009) *(quoting Capistrano Unified School District. v. Wartenberg*, 59 F.3d 884, 892 (9th Cir.1995)).

The court has reviewed the entire record, including the administrative record, which is over 8,400 pages.

## ISSUES ON REVIEW

The parents contend that the district denied the student a FAPE because (1) the student did not make progress in the goals and objectives set forth in IEPs; the transition plans in the IEPs were inadequate; and the district set a standard requiring that the district ensure that students achieve their academic creative and physical potential; (2) the student was changed from an adjustment program, emphasizing academic skills, to a life skills program; (3) the student was not provided appropriate assistive technology; (4) the student was not provided appropriate speech and language services; (4) the student was not provided with an appropriate or timely behavior plan, and was subjected to aversive interventions, in violation of state law; (5) the student was subjected to ongoing harassment; and (6) the parents were not afforded procedural safeguards when the district denied them a meaningful opportunity to participate in the IEP formulation process. Dkt. 21.

The district denies that the student was denied a FAPE, claiming that (1) there is no evidence of conduct rising to the level of harassment; there is no evidence that the district was deliberately indifferent to known instances of misconduct; and there is no evidence that alleged harassment was so severe that the student received no educational benefit from his program; (2) the district provided the student with an appropriate educational program because the IEP and evaluation teams were comprised of qualified and knowledgeable professionals; the student was appropriately reevaluated in 2003 and 2006, including the student's needs for assistive technology; the IEPs included clear and measurable annual goals and short term objectives; speech and language pathology services were appropriately provided; the student's behavior improvement plan was timely and appropriate; and transition planning was appropriate; (3) the student's change in location during the 2006-07 school year was a change in location but was not a change in placement; a time out room was not used as an aversive intervention; (4) the IEPs were appropriately implemented by teachers with sufficient knowledge of the student's disabilities; the IEPs were appropriately reviewed and revised; and (5) the parents had an opportunity to participate in the development of the IEPs. Dkt. 22.

## DISCUSSION

The parents are appealing the findings and conclusions of the ALJ. The decision of the ALJ is found at AR 21-77. In the following discussion, the court has paraphrased the relevant findings and conclusions of the ALJ, but has not specifically cited to the page numbers of the ALJ's decision.

**1. Adequacy of IEPs**

*Claim.* The parents contend that the education program, as set forth in the IEPs, was inadequate to provide the student with a FAPE. The parents maintain that the district failed to develop and implement clear and measurable annual goals and short term objectives, and failed to review and revise the student's IEPs when the student did not meet his annual goals. The parents contend that IEPs were not appropriate because they were based on incorrect assessments of the student's current abilities and skills; and that the student failed to make meaningful academic progress due to inappropriate goals and objectives, and due to the failure of the IEP team to rewrite goals and objectives when they were not met by the student.

*ALJ Findings and Conclusions.* The ALJ made the following findings and conclusions: The parents believed that the goals and objectives were not appropriate because they were not developed in conjunction with experts in LKS; the district's staff failed to properly educate themselves about LKS, and therefore had no understanding of the student's disabilities; and the cognitive testing of the student was flawed in that the testing focused on the student's verbal skills to the exclusion of the student's stronger visual abilities.

It is questionable whether any LKS expert exists; the parents' expert, Dr. deMenezes is a neurologist, with no expertise in the education of a child with LKS. Many of the witnesses, including district employees, were quite knowledgeable about the condition. District staff were educated sufficiently about LKS to enable them to plan appropriate educational goals. LKS is not difficult to understand. "As opined by several of the District's teachers and para-educators, the real education about this student comes from weeks and months of working with him daily and observing his abilities, challenges, behaviors, and emotions in the educational setting." When the parents presented information from Ms. Revelli, Dr. Fay and Dr. Uherek, the IEP team considered this information and included some of the recommendations. Many of the strategies and principles were already being done by the district in some form or another.

Testing of the student for the 2003 and 2006 re-evaluations relied on generally accepted measures, and testing was performed by school psychologists with sufficient knowledge of the student's disabilities to

perform an appropriate re-evaluation without consultation with an LKS expert. In the testing in 2003, the student's relative strength in visual skills over verbal skills was considered and accommodated in the testing. In 2006, a speech therapist evaluated the speech/language area; the student was found to require continued speech and language services in articulation, expressive, and receptive language. The 2006 evaluation did not repeat the IQ testing; the test administrator opined that there was adequate information in the prior records as to the baseline IQ. The 2006 evaluation showed that the student's strength was in reading, the lowest area of strength was in written language, and math was in between.

The student made progress in his 8th grade year at Aylen, according to his teachers. According to Ms. Lackey, the student did not make much academic progress during the time he was at Aylen. The student developed behavioral issues during his time at Aylen, and on many days he refused to perform any academic work at all. In February of 2007, the parents and district agreed that the student should be moved to the adjustment program at Ballou. The student's teacher at Ballou believed that little progress was made in the 2 ½ months he was at Ballou, although his behavior improved by the end of the school year. However, the student developed an extreme resistance to attending school, so his day was shortened. The parents believed that the student had a strong negative reaction to attending speech therapy at school, and that he had a personality conflict with or dislike of his therapist, Ms. Johnston.

Regarding the progress in 9th grade, the ALJ found as follows:

In sum, in 9th grade, the Student made some, albeit slow, academic progress. The delay in progress was directly due to his behavioral problems and emotional distress, leading to his refusal to perform most of the work in class. The reasons for this behavior are varied and any definitive cause is unknown, or undiagnosed, with many theories but no definitive evidence as to why he was acting out in 9th grade. His behaviors and emotional distress negatively affected his ability to obtain more meaningful benefit from the educational program.

AR 53. The parents and the district made attempts to discover the triggers for the behavior problems and distress of the student, and to control the behaviors so the student could function and benefit from his program. An FBA and BIP were developed and implemented at Aylen, and continued at Ballou with modifications. That did not resolve the problems completely at Aylen, but by the time the student's 9th grade year ended at Ballou, his behavioral acting out was generally under control. However, he was still not willing to perform the academic work, and had begun refusing to go to school or leave his home for any reason. The district offered extended school year services over the summer of 2007, but the parents

declined those services because the district believed those services should be provided at school rather than at home.

The district provided the student with a home bound program, beginning on October 2, 2007. A special education teacher, Ms. Westfpahl, provided 3 hours weekly of in-home instruction, and continued that at the library when the student was transitioning to the classroom setting at Rogers high school. The parents declined in home services with Ms. Johnson, but the student continued services with Dr. Winkler, the independent SLP. The IEP team met in November of 2007, to plan transition to the high school. In January of 2008, Ms. Westfpahl and the student began to work at the high school, on a one-to-one basis. The IEP team met twice in January 2008, and considered Dr. Uherek's input and an evaluation by Dr. Fay. The parents continued to reject speech services at Rogers if those services were to be provided by Ms. Johnston. The district extended its contract with Dr. Winkler, until April 18, 2008. Ms. Westfpahl opined that the student made progress in all academic areas during her time with him in the home, library, and in one-to-one classes at Rogers, and that the Student successfully met the IEP goals.

On February 4, 2008, the student began classes in a special education class with other children at Rogers. The student's teacher was Ms. Wojtala, and Ms. Ernest was his one-to-one para educator. Ms. Wojtala opined that the student made progress on all goals and objectives in his IEP from February to May of 2008. The student started out attending classes for a partial day, but those hours were increased incrementally. In April of 2008, the IEP team met and discussed starting a full day program for the student. The district offered the student speech and language therapy three hours weekly, pursuant to the recommendations of Dr. Winkler, Dr. Fay, Dr. Uherek, and at the parents' request. Although three of the district's speech therapists disagree that this much direct one-to-one therapy is required, the district offered this because the parents really wanted it.

During the hearing, the parents reported that the student had started refusing to attend school again.

In sum, the student made good progress in 8th grade; some, but very slow progress in 9th grade due to his emotional and behavioral issues; and good progress in 10th grade. The student's IEPs show an ever-increasing level of present performance, demonstrating growth across the IEPs. There is no definitive evidence to show why the student had so much distress emotionally and behaviorally in 9th grade, although

the parents blame this behavior on harassment by peers in 8th and 9th grade, and his dislike of Aylen in 9th grade.

To the extent that the IEPs were often repeated from one IEP to the next, that is because there had been insufficient time between IEPs for the student to master the objectives and goals fully.

Regarding the adequacy of the IEPs and the student's progress, the ALJ found as follows:

146. The preponderance of evidence shows that the IEP goals and objectives were individualized to the Student's needs, and were appropriate for him to obtain meaningful benefit from the educational programs. The IEPs were properly implemented by the staff. In 8th and 10th grades, the Student made good progress, in the opinions of his teachers and therapists.

147. In 9th grade, he made some progress, very slowly, but this has not been shown to have occurred because the goals or objectives were not appropriate, or because the IEP was not properly implemented, but primarily because the Student had a severe decompensation during this year in his behavior and emotions. There is no evidence that the District's treatment of the Student led to his violent and uncharacteristic behaviors that year. The record clearly shows that no person who testified, except the Parents, claimed to know why that behavior occurred, or if any one of the many variables present was the reason.

AR 57.

Regarding the transition plans in the IEPs, the transition plans are statements of the student's vocational and personal interests, and included a goal, following his education, that the student will live and work in a supported setting. Transition goals were included in the IEPs of November of 2006 and February of 2007. Each IEP beginning no later than November of 2007 indicates that the teachers will explore areas of vocational interest with the student as a regular part of the academic exercises.

The student was 16 years old in July of 2007, after 9th grade. The IEP developed for 10th grade added in the transition planning section that linkage with DDD [Department of Developmental Disabilities] and or DVR [Department of Vocational Rehabilitation] will be needed. The student was evaluated and accepted recently by DDD for such linkage and further transition planning. Dr. Uherek assisted the family with the DDD process. In addition to the formal statement of transition the IEPs contain goals and objectives that relate to assisting the student to move toward supported living and working. The IEP team considered the reports of Dr. Fay, Dr. Winkler, and Dr. Uherek in planning for the student's education and future; each of these persons has relative expertise in LKS. Given that the student has another five years of special education services before he is 21, Dr. Uherek does not believe that it was necessary for the district to plan for transition with any more specificity than it has done so far. "Her vision for the Student includes

supported living and employment as an adult, which are the transition goals included in the IEPs at issue."

The parents argue that the district has set an individual standard higher than the IDEA, promising or guaranteeing to maximize each student's potential. This assertion is based on statements made by the district Superintendent, in various District-wide publications, that this is the goal or aspiration of the district. These are not statements of policy by the district, adopted by the school board, but are mere statements of aspirational goals by the Superintendent. The evidence fails to show that any policy or standard was formally adopted by the district to maximize the potential of every student.

The ALJ concluded that, based upon the preponderance of the evidence, the IEPs were reasonably calculated to provide meaningful educational benefit to the student, at the time they were drafted. They were properly implemented by knowledgeable, trained staff, who knew the student, and who were familiar with his disabilities and unique needs. The IEPs considered the student's unique needs and abilities, his disability, and social, emotional, and other needs. The IEPs amply met the legal requirements for a FAPE from February 1, 2006, through June 10, 2008.

*Court Review.* The findings and conclusions of the ALJ are thorough and careful. The ALJ set forth the issues, made the relevant findings on factual issues, heard and evaluated the testimony of the witnesses, and carefully weighed the evidence. The court should accord deference to the findings of the ALJ. Moreover, the court has reviewed this voluminous record; the findings of the ALJ are well supported by the record. The findings and conclusions of the ALJ would be supported, even on de novo review. The court notes that provision of a FAPE under the IDEA is based on compliance with the standards of a State educational agency, not the local school district. *See* 20 U.S.C. § 1401(9)(B). The parents' claim that the education program, as set forth in the IEPs, was inadequate to provide the student with a FAPE, is without merit.

**2. Change in Program**

*Claim.* The parents contend that the student was wrongly changed from an adjustment program, emphasizing academic skills, to a life skills program when he was transferred from Ferrucci to Aylen for his 9th grade year.

*ALJ Findings and Conclusions.* The ALJ made the following findings and conclusions: After the student was withdrawn from school at Ferrucci on May 29, 2006, the district transferred him to Aylen for

his 9th grade year. The program at Aylen was not, contrary to the district's website, a work and life skills program. The teacher at Aylen, Ms. Lackey, who knows the academic content of both the adjustment program and the work and life skills program, testified that the program at Aylen was the same as the adjustment program offered to the student at Ballou later in 9th grade. This change of location for the student's 9th grade year to Aylen was not a change in placement, but a change in location of the adjustment program. Further, this was a voluntary move by the parents after they refused to return the student to Ferrucci.

*Court Review.* The findings and conclusions of the ALJ are thorough and careful. The ALJ accurately set forth the evidence elicited on this issue, made the relevant factual findings, heard and evaluated the testimony of the witnesses, and carefully weighed the evidence. The court should accord deference to the findings of the ALJ. Moreover, the findings of the ALJ are well supported by the record. The findings and conclusions of the ALJ would be supported, even on de novo review. The parents' claim that the student's placement was wrongly changed from an adjustment program to a work and life skills program, contrary to his evaluation and IEPs, is without merit.

It appears that the parents also contend in their opening brief that the program at Rogers is not an academic program, but a work and life skills program. Dkt. 21, at 25-26. This issue was not identified as an issue by the ALJ and was not included as a finding in the ALJ's decision. To the extent that this issue was presented at the hearing, it is addressed in this order in the context of the adequacy of the student's IEPs at Rogers.

### 3. Assistive Technology

*Claim.* The parents contend that an evaluation for the student's assistive technology needs was delayed and that the services recommended were not provided to him.

*ALJ Findings and Conclusions.* The ALJ made the following findings and conclusions: The time period at issue was from February 1, 2006, to the end of the school year in 2005-2006 (8th grade), and from the start of school in September 2006, to the time when assistive technology services were fully provided by December of 2006. Sean Iddings observed the student in the classroom in the Fall of 2005, and recommended various low tech assistive technology strategies; these strategies were implemented and then evaluated by the SLP. The student's SLP, Ms. Messick, implemented the Picture Exchange

Communication system, but the parents believed that computer technology would be more effective for the student. Throughout 8th grade, the student's special education teachers used a wide variety of low technology assistive technology devices for the student. In February of 2006, the mother requested a formal assistive technology evaluation; the evaluation was performed in September of 2006, at the start of 9th grade. The Links Plus device was available in October of 2006, and Clicker 5 was being used by November of early December of 2006. A private speech therapist, Marci Revelli, performed an assistive technology evaluation in December of 2006; Clicker 5 and a couple of other computer software programs were recommended. Ms. Revelli recommended against a speech-generating device, but stressed the need for speech therapy to help the student with his speaking skills, rather than focusing on the use of computers to do all of the student's communicating. The student was not excited about using Links Plus, a small computerized voice machine. The student was successful in using Clicker 5, which included lessons on math, reading, science, history, and writing. The parents' argument that the content of the academics was not of interest to the student nor geared to his individual interests is not supported by the evidence. Pursuant to the OSPI order, the parents were provided with compensatory assistive technology services for the delay in assistive technology between 2004 and 2006. The three hours of weekly speech therapy with Dr. Winkler was, in part, to allow for use and training on Clicker 5 as compensatory assistive technology services. The student's absences, and his leaving school several weeks before the year's end, delayed the assistive technology evaluation. The delay in using Clicker 5 and Links Plus is not unreasonable. The parents' expectation that these things would occur immediately, and that the staff would already be fully trained in the use of new software being used only with this student is not realistic. During the period at issue in this case–February 1, 2006 to June 2008–the district has not been shown to have significantly delayed the use of appropriate assistive technology services to the detriment of the student. The student received compensatory educational services for any delay in implementing the assistive technology services. Finally, the ALJ concluded as follows:

> The Parents desire that the Student receive all of his academic content on a computer. In the alternative, they seem to want some other high-tech solution to the Student's challenges, which was never specifically identified in the hearing. The educators who testified or provided reports, as well as the speech therapists, including Dr. Winkler and Ms. Revelli, the Parents' witnesses, do not recommend that all of the Student's communication take place on the computer. The speech experts generally opined that it is important that the Student have a language-rich classroom and home environment and that he learn to communicate verbally to the best of his ability.

AR 45.

In conclusion, through resolution of the OSPI complaint, the parents have been compensated with additional assistive technology services for any delay in getting the computer-based technology programs set up. The student has benefitted from lower tech assistive technology during the entire period at issue, all of which assisted him to access the special education program in his IEP.

*Court Review.* The findings and conclusions of the ALJ are thorough and careful. The ALJ accurately set forth the evidence elicited on this issue, made the relevant factual findings, heard and evaluated the testimony of the witnesses, and carefully weighed the evidence. The court should accord deference to the findings of the ALJ. Moreover, the findings of the ALJ are well supported by the record. The findings and conclusions of the ALJ would be supported, even on de novo review. The parents' claim that an evaluation for the student's assistive technology needs was delayed, and that the services recommended were not provided to him, is without merit.

**4. Speech and Language**

*Claim.* The parents contend that the district did not provide the student with adequate speech and language services.

*ALJ Findings and Conclusions.* The ALJ made the following findings and conclusions: As part of the resolution of the OSPI complaint, the district contracted with Dr. Sheila Winkler to provide speech therapy for the student from March of 2007 through April 18, 2008; these sessions were provided as compensatory speech therapy for the period of January of 2005 to March of 2007, as well as to meet current requirements for speech therapy from March 2007 to April 2008; the district authorized sessions for three hours weekly of direct speech therapy during the second part of the 2006-2007 school year, and nearly all of the 2007-2008 school year. AR 38. The district also offered these services three times a week during the summer. AR 38. The student's IEP required an additional hour of direct speech therapy at school each week in 2006-2007 and 2007-2008. One of the district's speech therapists, Lisa Johnson, who worked with the student in 9th and 10th grades, believed that the student would benefit more by being in class, in the environment in which he must use the language skills by interacting with teachers and peers. The student engaged in speech therapy with Dr. Winkler, although the student was unable to attend many of the sessions authorized by the district. Dr. DeMenezes, Dr. Uherek, Dr. Fay, and Dr. Winkler all

agreed that speech therapy is critical for LKS patients. Intensive speech therapy is particularly important when a student is young. Ms. Johnston worked with the student. The evidence failed to show that the student had a personality problem with Ms. Johnston.

The district offered the student the amount of speech therapy he required and the amount recommended by his private speech therapist, and requested by the parents. Compensatory speech services were provided to the parents through resolution of the OSPI complaint. The parents and student are not entitled to further speech services.

*Court Review.* The findings and conclusions of the ALJ are thorough and careful. The ALJ accurately set forth the evidence elicited on this issue, made the relevant factual findings, heard and evaluated the testimony of the witnesses, and carefully weighed the evidence. The court should accord deference to the findings of the ALJ. Moreover, the findings of the ALJ are well supported by the record. The findings and conclusions of the ALJ would be supported, even on de novo review. The parents' claim that the district did not provide the student with adequate speech and language services is without merit.

### 5. Aversive Intervention

*Claim.* The parents maintain that the school used a time-out or isolation room as an aversive intervention in violation of the student's IEPs and in violation of state law.

*ALJ Findings and Conclusions.* The ALJ made the following findings and conclusions: The small room inside Ms. Lackey's classroom in 9th grade at Aylen, and the small room at the nurse's office, were used as quiet areas for the students, including the student, to avoid noise disruption, or to go to voluntarily get away from too much stimulation or when escalated. On one emergency occasion, on February 7, 2007, the student was told to go to the quiet room, but was not physically forced to do so. During the February 7, 2007, incident the student's behavior became out of control and a danger to himself and to the other students. Other students were removed from the classroom, and the student was told to go to the quiet room to calm down, which he did on his own, although he continued yelling and thrashing in the room. The student was not physically restrained, and adults were present at all times, able to see the student in the room. The student eventually calmed down and left the room. A campus security officer was sent to the room during this incident; this was the only time the security officer was called due to the student's behavior in Ms. Lackey's room. The para educator was mistaken when she testified that security was

called many times on the student while he was in Ms. Lackey's room at Aylen. The student was never told to go to a quiet room, or any room, for disciplinary reasons. On a couple of occasions, the student was told to go into the small cubby-hole room next to the nurse's office to calm down when he became escalated. The student was not sent to the room as discipline, but was told or encouraged to enter the room to allow him to quiet from being overstimulated. Dr. Winkler and Dr. Uherek opined that use of a quiet area for the student to get away from repetitive noises, singing, or any other disturbance was an acceptable and positive intervention for the student.

The use of a quiet room or area, offered to the student to go to voluntarily if some noise disrupted or agitated him, is not an aversive therapy. This strategy or service did not have to be included in the IEP. The quiet room was not used as any systematic treatment of the student, and it was not used to discourage undesirable behaviors. The student was allowed to go into these rooms when upset, disturbed, or annoyed; he could also leave when he wanted to do so. On February 7, 2007, when the student's behavior was such that he presented a clear and present danger to himself and others, and when his behavior disrupted the educational process substantially, he was told to go to the quiet room. The student went to the room voluntarily; he was not physically restrained or touched by staff. This situation was a definite emergency which meets all three of the requirements in WAC 392-172A-03120, and is not within the definition of aversive intervention under WAC 392-172A-03120(1). The district did not apply any aversive intervention to the student; there is no evidence that the student was ever denied a FAPE by use of the quiet room.

*Court Review.* The findings and conclusions of the ALJ are thorough and careful. The ALJ accurately set forth the evidence elicited on this issue, made the relevant factual findings, heard and evaluated the testimony of the witnesses, and carefully weighed the evidence. The court should accord deference to the findings of the ALJ. Moreover, the findings of the ALJ are well supported by the record. The findings and conclusions of the ALJ would be supported, even on de novo review. The parents' claim that the school used a time-out or isolation room as an aversive intervention in violation of the student's IEPs and in violation of state law is without merit.

**6. Behavior Plan**

*Claim.* The parents claim that the district failed to complete a timely and adequate functional behavioral assessment (FBA) and behavior improvement plan (BIP). The parents contend that the

student's behavior problems started in 8th grade when school refusals began; that the parents asked for the FBA/BIP in November of 2006; that the BIP should not have been put on the "back burner"; and that no LKS expert was brought in to assist the team.

*ALJ Findings and Conclusions.* The ALJ made the following findings and conclusions: Before 9th grade at Aylen, the student's work avoidance behavior did not merit an FBA and BIP, since the teachers were able to redirect the student to work. When the student's behavior changed in 9th grade, with outbursts and violent incidents, the IEP team involved a behavior support specialist at the November 2006 IEP meeting. Ms. Goodsell, the specialist, began to gather data, observed the student in class, and made informal suggestions to the staff for managing behavior. Ms. Goodsell went forward with the FBA and BIP, which were ready for discussion at the February 2007 IEP meeting. However, because the IEP team was rewriting the IEP from scratch, at the parents' request, the focus was on the IEP rather than the BIP. The parties met in March of 2007 to discuss the FBA/BIP. In the meantime, the teachers continued implementing behavioral intervention strategies suggested by Ms. Goodsell. The parents participated in the FBA/BIP meetings, and voiced written objections. The formal BIP was incorporated into the IEP on May 1, 2007. Overall, the FBA and BIP's were drafted as timely as was possible under the entirety of the circumstances, and appropriately addressed the Student's behavioral needs. The parents wanted specific triggers (singing, tapping, whistling) included in the BIP. The IEP team did not believe that those triggers were issues for the student at that time, but added "loud noises" and "close proximity" to the BIP. The BIP was updated in 10th grade, as the student's needs and behaviors changed.

The FBA and BIP were timely in 9th instead of 8th grade, because, in the opinion of his special education teacher, the student's behavior was not impeding his learning in 8th grade. The teacher could easily redirect him to work when he had avoidance of work behavior. He had no violent or acting out behaviors until 9th grade. The primary reason for the delay in developing the FBA and BIP in 9th grade was that the parents demanded to re-write every goal and objective in the IEP from scratch. This required three IEP meetings and hours of staff time, and took time away from the review and finalization of the FBA/BIP. The new IEP took priority at that time because of the deadline to comply with the OSPI agreement. During this time, the teachers were implementing behavior strategies recommended by the behavior specialist. The FBA and BIP were conducted and written by a behavioral specialist, with input

from the parents, teachers, speech therapists, and an occupational therapist who is also a behavior specialist. The parents' input into the FBA and BIP was fully considered, and the parents' claim that the wording they demanded (there is some question whether this wording was requested at the time the BIP was drafted) was not included does not make it an inappropriate or flawed BIP. The BIP was reasonably calculated at the time written to confer a meaningful benefit to the student in helping him and his teaching staff to cope with his anxiety and any inappropriate behavior. The parents have not proven that the district violated the IDEAS in drafting and implementing the BIP during the student's 9th grade year, or that the BIP violated the IDEA because of its wording.

*Court Review.* The findings and conclusions of the ALJ are thorough and careful. The ALJ accurately set forth the evidence elicited on this issue, made the relevant factual findings, heard and evaluated the testimony of the witnesses, and carefully weighed the evidence. The court should accord deference to the findings of the ALJ. Moreover, the findings of the ALJ are well supported by the record. The findings and conclusions of the ALJ would be supported, even on de novo review. The parents' claim that the district failed to complete a timely and adequate FBA and BIP is without merit.

**7. Harassment**

*Claim.* The parents contend that the student was harassed at school; that the district was deliberately indifferent to the harassment; that the parents never knew about the harassment; and that the student was unable to comply with his educational program because of the harassment.

*ALJ Findings and Conclusions.* The ALJ made the following findings and conclusions: The OCR complaint was based upon the same alleged harassment that plaintiffs alleged at the due process hearing, the OCR found those allegations unsubstantiated, and the district took prompt and effective action to address the incidents in question. The parents' claim that the student's 7th grade teacher told them that, in May of 2005, harassment of the student had occurred in the commons ,was based solely on uncorroborated hearsay, and then only in very general terms.

Regarding the parents' claim that Student A had harassed the student, when Student A engaged in intentionally annoying conduct toward the student, over a period of weeks, he was counseled; the teacher discussed the issues with Student A's mother; Student A was reprimanded and re-trained on the district's harassment policies; Student A was separated from the student; Student A had no unsupervised contact

with the student; Student A was moved to a different program and classroom; and when the student's mother told the teacher about the hot sauce she found on the student's belongings, the teachers investigated the incident, found that is was Student A who had done it, and disciplined him. The district took appropriate and immediate action to limit student A's behavior, and disciplined him repeatedly. When that failed to change his behavior within weeks, the staff separated him from the student and eliminated the contact between the two children. Finally, student A was moved out of the student's classroom permanently.

Regarding the singer (Student B), the parents' allegation that Student B's singing was tormenting the student, to the point of depriving him of an appropriate education, is not supported by the evidence. In 8th grade, Student B's singing was primarily limited to the five minute break outside the classroom between classes, and the student was told he could remove himself to a quiet room within the classroom if he was bothered by the singing. In 9th grade, the student was able to tell Student B to stop singing, or the student could move to a quieter area. Ms. Lackey, the 9th grade teacher, did not believe that the singing caused the student's behavior to escalate. The student was told that it was not inappropriate for Student B to sing in the hallways; and that the student could stay away from the hallway when Student B was there. The singing by Student B was not a significant problem for the student in 8th or 9th grades, and was not any kind of harassment, teasing, or bullying which the district ignored.

Regarding the parents' concerns in the early morning when student went from the bus to his classroom, the district arranged for an adult staff member to accompany the student in 8th grade at Ferrucci, and in 9th grade at Aylen and Ballou. On one occasion in early 2006, when the bus arrived early, and some unidentified students whistled at the student, the matter was investigated, a group of students was warned against harassment by the security officer, and the bus drivers were instructed not to drop student off early.

The parents did not carry their burden to prove actual harassment; that the district was indifferent to this harassment under the circumstances; or that the student derived no benefit from the educational services because of the harassment.

*Court Review.* The findings and conclusions of the ALJ are thorough and careful. The ALJ accurately set forth the evidence elicited on this issue, made the relevant factual findings, heard and

evaluated the testimony of the witnesses, and carefully weighed the evidence. The court should accord deference to the findings of the ALJ. Moreover, the findings of the ALJ are well supported by the record. The findings and conclusions of the ALJ would be supported, even on de novo review. The parents' claim that the student was harassed at school; that the district was deliberately indifferent to the harassment; that the parents never knew about the harassment; and that the student was unable to comply with his educational program because of the harassment, is without merit.

### 8. Procedural Safeguards

*Claim.* The parents contend that staff came to IEP meetings with pre-printed IEPs and did not consider the parents' input; that the team held pre-IEP meetings without the parents present; and that the schedules for the IEP meetings did not take into account the parents' schedules, so that only one parent could attend the IEP meetings. As a result, the parents claim that they were denied the procedural safeguards mandated by the IDEA.

*ALJ Findings and Conclusions.* The ALJ made the following findings and conclusions: There was little, if any, evidence presented at the hearing to support the claim that the parents were not provided with prior written notices, that the parents were not invited to IEP meetings, or that the district disregarded the parents' schedules in setting IEP meetings. At least one parent attended every IEP meeting. There was no showing that the student's educational opportunities have been negatively affected by the procedural issues, or that the parents' right to participate in the educational process was seriously infringed.

*Court Review.* The findings and conclusions of the ALJ are thorough and careful. The ALJ accurately set forth the evidence elicited on this issue, made the relevant factual findings, heard and evaluated the testimony of the witnesses, and carefully weighed the evidence. The court should accord deference to the findings of the ALJ. Moreover, the findings of the ALJ are well supported by the record. The findings and conclusions of the ALJ would be supported, even on de novo review. The parents' claim that they were denied procedural safeguards is without merit. *See J.S. v. Mercer Island*, 2009 WL 2393323 * 13 (C.A. 9 (Wash.))(preplanning meeting in the absence of parents does not constitute procedural violation).

### 9. Washington Education for All Act

The parents have alleged that the district violated the Washington Education for All Act, RCW 28A.155. The only separate claim under this statute is regarding the quiet room/aversive intervention issue. That issue was discussed above and the claim was determined to be without merit.

**10. Additional Comments on Review of the Record**

The court has carefully reviewed the entire record in this case. It is apparent that the parents believed that they were acting as advocates for their child, in attempting to obtain an education that would maximize his potential. What is also apparent from the record is the dedication, competence, and professionalism of the teachers, staff, professionals and administrators of the district. This team used their skills to assess the student's educational needs, adapted to changes in the student's behavior, revised the student's educational program as his needs changed, welcomed suggestions from outside professional sources, and attempted to respond without rancor to the parents' requests and demands. The district provided the student with a meaningful educational benefit. The record is clear, however, that the district's team did more than that, by making consistent effort to maximize the student's potential.

**11. Remedies and Attorney's Fees**

The parents have asked for numerous remedies. Dkt. 3, at 16-19. Because the court has determined that the student was not denied a FAPE, there is no basis for those remedies. Further, because plaintiffs have not prevailed on their claims, there is no basis for awarding attorney's fees. *See* 20 U.S.C. § 1415(i)(3)(B).

**12. Conclusion**

The findings and conclusions of the ALJ were thorough and careful. They accurately reflect the record. The district provided a FAPE to the student during the period from February 1, 2006, to June 10, 2008. The decision of the ALJ, on behalf of the State of Washington Superintendent of Public Instruction, should be affirmed, and the complaint should be dismissed.

Therefore, it is hereby

**ORDERED** that decision of the ALJ for the State of Washington Superintendent of Public Instruction is **AFFIRMED**. The complaint and this case are **DISMISSED**.

The Clerk is directed to send uncertified copies of this Order to all counsel of record and to any party appearing *pro se* at said party's last known address.

DATED this 10th day of September, 2009.

Robert J. Bryan
United States District Judge